Fremont-Smith, J.
In this case, the plaintiff alleges that he was abused by two Catholic priests, O’Donoghue and Inzerillo, and that the former Bishops of the Worcester Diocese, Flanagan and Harrington, were negligent in their continued employment and supervision of those priests. Plaintiff seeks a default judgment against defendants or other sanctions on the grounds that defendants and their attorneys have “engaged in a persistent pattern and practice spanning several decades of improper conduct which has subverted the spirit and intent of the discovery process, and specifically and more recently has significantly disrupted the discovery process in this action.”
In support of his motion, plaintiff alleges that the Diocese has been guilty of “spoliation” (i.e., cover-up and nondisclosure) of evidence of sexual assaults on children by priests from the 1950s through the 1980s.
Specifically, as regards to this case, plaintiff alleges that such suppression of evidence included nondisclosure of allegations involving sexual assaults by O’Donoghue on other children prior to the 1978 rape *649 of plaintiff alleged in this case; suppression of letters written to Gagne by O’Donoghue by Bishop Flanagan or other diocesan representatives; failure to disclose the identity of other known victims of sexual assault by O’Donoghue prior to plaintiffs alleged rape; suppression of a study on pedophilia among priests which the Diocese received in 1971-72; failure to disclose the whereabouts of a “key witness," Thomas Kane (former Executive Director of the House of Affirmation, where O’Donoghue was treated and who is the only remaining witness who could authenticate the study on pedophilia); disruption of the deposition of Thomas Kane; and disruption of the deposition of Stephen LaBaire by defendants’ counsel.
As a result of this alleged misconduct, plaintiff seeks an order of default judgment, or in the alternative, the striking of affirmative defenses of defendants, including statute of limitations and charitable immunity defenses, as well as costs associated with the location of Kane, his further deposition, and this motion.
In support of his generalized allegation of “spoliation,” plaintiff makes several arguments. First, plaintiff faults the policy of Bishop Harrington, who testified that when the Diocese received a complaint of priest misconduct which a priest denied, the Diocese would take no further action unless the complainant child was willing to repeat the allegations in a face-to-face confrontation with the accused priest. While the plaintiff rightly points out that such a confrontation could be perceived by young children and their parents as intimidating, thereby, as a practical matter, obstructing any further investigation, and while such a policy of the Diocese, if established at trial, may certainly be relevant on the issue of whether the Diocese was negligent, this Court concludes that such a policy did not violate any statute or rule of the Massachusetts courts such as would warrant the imposition of sanctions.
Next, plaintiff faults Bishop Harrington’s admitted policy of never notifying law enforcement authorities, even in the event that he believed the accusations, because, as he testified at deposition, under applicable law he was not legally required to do so and it might have appeared that he was accepting “an iffy situation as being absolutely without doubt guilty.” He further testified that it was his policy to remove accused priests from active ministry only “when they admitted their misbehavior, or when their case became public.”[1] Although such a policy of the Diocese also might well be considered to be evidence of negligence (as constituting a failure to take reasonable steps to prevent a foreseeable risk of future injury to the same or other children), it has not been shown to have violated any statute or rule of the courts of the Commonwealth so as to justify sanctions in this particular case.
The next incident relied upon by plaintiff pertains to evidence that defendant O’Donoghue was notified by the Diocese that two complaints of sexual misconduct regarding a child had been made to him in the 1950s, even though no written complaints or documents referencing such allegations against O’Donoghue have been produced by the Diocese, in spite of plaintiffs document requests for same. Plaintiff also points out that O’Donoghue was transferred twelve times within the Diocese, which is an extremely unusual number of transfers, from which plaintiff infers that numerous other complaints of misconduct were made against O’Donoghue, regarding which there should be documentation in addition to the single letter dated November 8, 1955 (in which he was notified that Bishop Wright was relieving him of his sixth assignment and sending him to another parish). Plaintiff complains, moreover, that although the Diocese did produce this document, it did so without a handwritten note which appeared on the original of the document (later produced by O’Donoghue over Bishop Wright’s signature) which stated “this is a vote of confidence. Don’t let me down.” O’Donoghue further testified at deposition that the pastor of St. Peter’s parish told him that Bishop Flanagan had telephoned the pastor to say that Bishop Flanagan had received a complaint that O’Donoghue had engaged in inappropriate sexual contact with a child, as to which the Diocese has produced no documentation.
Defendant’s counsel represented to the Court at the hearing, however, that a document search had been conducted by the Diocese, and no documents relating to any of these alleged incidents were found. She also pointed out that it would not be unusual for a file copy of a letter to not contain a handwritten annotation, such as was found on the original document in O’Donoghue’s possession. While the absence of any documentation of allegations of misconduct by a still-active priest, if the allegations occurred, may be puzzling, the Court cannot find, on the paper record before it, that any culpable withholding of evidence has been proven. The Court does order, however, that a further, thorough document search be undertaken by the Diocese.
Plaintiff further contends that Bishop Harrington and the Diocese have indicated, by way of deposition and discovery responses, that no reports of sexual misconduct were received concerning O’Donoghue, other than one anonymous phone call in July 1994 received by Bishop Rueger, in which the caller described three incidents of molestation by O’Donoghue while he was at St. Peters in 1960-63.
In this regard, plaintiff complains, the Diocese answered plaintiffs interrogatoiy #14, which inquired in regard to any information of any inappropriate sexual contact by O’Donoghue, as follows:
In July 1994, Bishop George E. Roeger received a telephone call from an individual. He had called to add his complaint to the one about which he had read with reference to Father O’Donoghue. He [the *650 caller] knew Father O’Donoghue when he was between the ages of twelve and eighteen as a member of St. Peter’s parish in Worcester. He alleged he had been molested three times by Father O’Donoghue. Bishop Roeger informed Bishop Harrington that he discussed therapy with the person. The person never followed up on this call.
Plaintiff complains that, by its answer, the Diocese clearly implied that the caller did not identify himself, since the interrogatory had specifically asked for the identity of any such informant, but that subsequently, this caller contacted plaintiffs counsel and has provided an affidavit that, in his telephone conversation with the Bishop, he had provided his name, and that the Bishop had known him and his family for years. The informant (Robert P. King), has further testified that Bishop Roeger then met with King, and, at a forfy-five minute meeting, Bishop Roeger was told by King about the details of three incidents of sexual molestation by O’Donoghue in 1962 and 1963.
This, however, is denied by the Diocese, which has filed an affidavit of Bishop Roeger, in which he states, under oath, that while he remembers talking on the telephone with a person who accused O’Donoghue of sexual abuse years ago, “I have no memory of having met with or even spoken to any person that I know to be Robert King at any time. I do not have any memory of ever being told the name of any individual other than the plaintiff who says that they had been molested by the defendant O’Donoghue.”
While it may seem unlikely, if King did identify himself to Bishop Roeger (who admitted in his affidavit to having known the King family) that the Bishop would not have remembered being told this or have remembered a personal meeting with King, the Court is faced, even in that event, with an issue of credibility as to whether King or Bishop Roeger is not telling the truth. This Court cannot, on this paper record, make any such determination of credibility, or impose sanctions based on what, at this point, is mere possibility or speculation.[2]
In addition, plaintiff contends that the Diocese suppressed a key study on pedophilia in the priesthood, citing a study document entitled ‘The Role of the Church in the Causation, Treatment and Prevention of the Crisis in the Priesthood,” by Conrad W. Baars, M.D., which was distributed to Bishop Flanagan, as a representative of the Diocese. The study informed the hierarchy that a significant percentage of priests suffer from emotional immaturity expressed in inappropriate sexual behavior, and made specific recommendations designed to protect children from sexual molestation by such priests.
The Court, however, has carefully reviewed each of plaintiffs requests for production of documents upon which it relies, and finds that none of them fairly call for the document in question. Thus, some of the document requests call for writings which evidence the Church’s “teachings or positions” relating to priest misconduct or standards of conduct (nos. 20, 21, 22, 23, 24), whereas others relate to “rules, regulations, policies or protocols, written or oral, established by you concerning the procedures to be followed” with respect to complaints of sexual misconduct by priests (request No. 43). The unrebutted testimony of the Diocese, however, was that Baar’s study and recommendations were never adopted or implemented by the Diocese in any way, so that it never was a “policy or standard of the Diocese,” or a “teaching or position” of the Diocese. As it was not fairly called for by the document requests, it cannot form the basis for any imposition of sanctions by this Court.
Plaintiff next complains about the Diocese’s failure to disclose the whereabouts of Thomas Kane, whom the plaintiff describes as the only still-living witness who can authenticate the above-mentioned study by Conrad Baars, M.D. While the study may certainly be viewed as an important document in regard to the alleged knowledge of the Diocese concerning the problem of pedophilic priests and its alleged negligent failure to adopt the recommendations therein (or other effective measures to remove such priests from the ministry) the Court’s attention has not been called to any interrogatoiy which fairly requests the address of Kane.[3] Although, in Interrogatory No. 20, the Diocese was required to set forth the names and addresses of all persons with knowledge of sexual misconduct alleged in the complaint, and although Kane was the director of Affirmation House, a treatment center for priests at which O’Donoghue briefly resided, the Court’s attention was not called to any place in Kane’s deposition or elsewhere where it was shown that Kane had personal knowledge of any of the events alleged in the complaint. Accordingly, no basis has been shown that the Diocese was obligated to identify him in its answer to Interrogatory No. 20.
Plaintiff also contends that, by letter and verbally, it requested defendant’s counsel to ascertain his residence, and that defendant’s counsel informally indicated she would attempt to do so. Defendant’s counsel asserts, however, that upon learning that, although Kane was mailed monthly stipends by the Diocese, they were mailed to a post office address, she did not feel it necessary to make any further inquiry. Such informal requests and counsel’s response thereto, while perhaps coming close to the ethical line,[4] do not amount to any violation of any statute or any rule of the Courts of the Commonwealth. Accordingly, the nondisclosure of Kane’s whereabouts forms no basis for sanctions.
Plaintiff further contends that, at the time Gagne was abused, he told his mother about it, who called Bishop Flanagan and made an appointment with him. Mrs. Gagne has testified that she, her husband and Gagne met Bishop Flanagan in 1978, and gave to Bishop Flanagan several letters which Gagne had *651 received from O’Donoghue, which could be viewed as incriminating. Bishop Flanagan testified, at his deposition, however, that he had “no recollection at all of meeting or any communications with Edward Gagne at any time.”[5] Despite appropriate discovery requests, these letters which Gagne’s parents allegedly gave to Bishop Flanagan, have not been produced. The Diocese, however, has filed an “affidavit of Edmond T. Tinsley,” which states that “he is the person primarily responsible for searching for documents and information which have been requested of the Diocese in this lawsuit," and that “he spoke to Bishop Flanagan about the cards and letters which [plaintiffs counsel] had requested. Bishop Flanagan told me he had not received these materials.” Although the Tinsley affidavit does not indicate that the Diocese’s search and inquiry concerning these letters was more than cursory (apparently consisting merely of asking Bishop Flanagan whether he recalled whether he was given such letters in 1978), it cannot be found, based upon the representation of defendant’s counsel at the hearing (at which she represented to the Court that no such letters could be located) that there has been any culpable disobedience of defendant’s duty to respond to discovery requests or to any related court order. In view of the apparently cursory nature of the document search, however, the Court will order that a further thorough search of all relevant files be made by the Diocese within thirty days, and that any documents called for by plaintiffs document requests be immediately produced.
Finally, plaintiffs counsel complains of defendant’s counsel’s alleged disruption of the depositions of King and of Stephen LaBaire (another priest of the Diocese).
Rule 30(c) of the Massachusetts Rules of Civil Procedure provides in pertinent part as follows: “Evidence objected to shall be taken subject to objections.” Mass.R.Civ.P. 30(c). As noted in Dominick v. Troscoso, 5 Mass. L. Rptr. 466 (Essex Superior Court No. 94-2395-B, June 1996, Grabau, J.), moreover,
The United States District Court interpreted a similar provision in the Federal Rules of Civil Procedure to mean that, as a general rule, instructions not to answer questions at a deposition are improper. Paparelli v. Prudential Insurance Co. of America 108 F.R.D. 727, 730 (D.Mass. 1985), citing International Union of Electric Radio and Machine Workers, Etc. v. Westinghouse Electric Corporation, 91 F.R.D. 277 (D.D.C. 1981). The only exception to Rule 30(c) would be in those situations where serious harm would be caused. Id. An answer to a deposition question revealing trade secrets, privileged material or other confidential material is considered to cause some serious harm. Pararelli, at 731. In thofee situations, an instruction not to answer would be proper but the party who instructs the witness not to answer should immediately seek a protective order. Id.
See also, Cholfin v. Gordon, 3 Mass. L. Rptr., No. 17, 356, 362 (Civil No. CA94-3623, Middlesex Super. Ct., April 24, 1995); Boyd v. University of Maryland, 173 F.R.D. 143 (D. Md. 1997) at 147; Ethicon Endo-Surgery v. U.S. Surgical Corps, 160 F.R.D. 98 (S.D. Ohio, 1995); Hall v. Cifton Precision, 150 F.R.D. 525 (E.D.Pa. 1993).
The Court has reviewed the relevant portions of transcripts of the depositions in question and finds that defense counsel James Reardon of the Worcester law firm of Reardon & Reardon has repeatedly disrupted the depositions by raising improper objections, instructing the witnesses not to answer questions without justification[6] and even, on one occasion, by threatening the witness Kane with legal consequences if he answered particular questions. While some of plaintiffs counsel’s questions did approach the outer limits of relevancy, even for purposes of discoveiy or to show bias, and while a few could be expected to embarrass the witnesses, this Court, in view of Reardon’s repeated disruption of the depositions, will order the questions answered responsively subject to a protective order, and order that any further or resumed depositions be conducted without the presence of Reardon. (See this Court’s separate order with respect to plaintiffs motion to compel Kane to answer questions at deposition.)
While the evidence called to the Court’s attention at this hearing would certainly warrant a finding, after trial, if believed by a jury, that the Diocese has, for decades, failed to take appropriate action to remove from the priesthood known sexual predators at a time when it knew or should have known that such inaction posed a foreseeable risk of further assaults upon the same or other youngsters, such as the plaintiff, and although the evidence certainly suggests the strong possibility that diocesan officials and/or their counsel may have engaged, in this and in other cases,[7] in a “cover-up” of evidence regarding the extent of their knowledge of the presence of sexual predators in the priesthood, the Court finds that, based upon the paper record before it, these allegations, while not frivolous, remain, for purposes of this motion, unproven, and provide no basis for sanctions except to the limited extent of the following Order.
ORDER
For the reasons stated above, it is Ordered that: (1) Attorney James G. Reardon of the Worcester law firm of Reardon & Reardon is barred from attendance at any further depositions in this case.
(2) The Diocese shall immediately conduct a further thorough search of all relevant files in its possession, custody or control, and shall produce, within thirty days of its receipt of this Order, all documents which have been requested by the plaintiffs document requests, (except to the extent any objection to such document requests has been sustained by previous order of this Court).
*652 (3) Defendant’s counsel shall personally supervise the document search required by paragraph (2) of this Order, and shall file and serve an affidavit, within thirty days of receipt hereof, which specifies (a) a description of each file searched, and, with respect to each file searched, (b) an identification of the person(s) who conducted the search of each such file, (c) how many documents were reviewed in each such file, (d) the amount of time spent on the search of each such file, and (e) an identification of each called-for document found in each such file.
(4) Each document withheld from production under claim of privilege, if any, shall be identified, in the affidavit, by date, addressor, addressee and general description of such document’s content.
(5) Plaintiffs motion for sanctions is otherwise DENIED.

 Although Bishop Harrington did not dispute, at his deposition, that another reason for this policy of inaction was to protect the good name and reputation of the church, one wonders how he could have believed that the normal Catholic could be expected to be more scandalized by the revelation that there are pedophiles in the priesthood, than by the revelation that, allegedly for decades, when pedophiles were exposed, rather than being removed from the active ministry, they were frequently merely reassigned to another parish where they could continue, with impunity, their assaults on other unsuspecting youngsters.

 At trial, of course, the Court may consider whether the jury might be appropriately instructed that if, based upon the evidence, they believe the Diocese has engaged in the intentional withholding of evidence, an inference of “consciousness of guilt” might be drawn against it.

 His whereabouts was subsequently ascertained by plaintiffs counsel, through a private investigator, and he was deposed.

 While defendant’s counsel’s response to plaintiffs counsel’s informal request may have been equivocal and thus misleading, plaintiffs counsel could not reasonably have relied thereon. Plaintiffs counsel was certainly aware that defendant’s counsel had an obligation, to her client, not to volunteer any damaging evidence which was not called for by a proper discovery request.

 A page from Bishop Flanagan’s appointment book, however, appears to indicate that in 1978, such a meeting took place.

 For instance, although Reardon on occasion asserted the patient-psychiatrist and priest-penitent privileges, another judge of this Court (Toomey, J.) has previously ruled in this case that such privileges do not apply to the type of communications at issue.

 See: this Court’s “memorandum and order on plaintiffs motion for sanctions,” dated June 30, 1998, in Yerrick v. Robert Kelley, et. al. Worcester Sup. Ct. No. 95-1712 c, 8 Mass. L. Rptr. 556.